# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF OKLAHOMA

JESSE JAMES ANDERSON,     )
    )
        Petitioner,     )
    )
v.     )    **Case No. CIV 13-157-JHP-KEW**
    )
WILLIAM MONDAY, Warden,     )
    )
        Respondent.     )

## OPINION AND ORDER

This matter is before the Court on Petitioner's petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. Petitioner, who is represented by counsel, is attacking six convictions arising from his non-jury trial in Pontotoc County District Court Case No. CF-2008-499 for First Degree Burglary (Count 1), Robbery by Force or Fear (Count 2), Robbery by Force or Fear (Count 3), Larceny of a Vehicle (Count 4), Leaving the Scene of a Personal Injury Accident (Count 6), and Larceny of a Vehicle (Count 7). He presents one ground for relief:

> Mr. Anderson's convictions were based on an unreasonable determination of the facts in light of the evidence presented at the state court proceedings, because no reasonable factfinder could have determined the State proved Mr. Anderson sane beyond a reasonable doubt.

Respondent concedes that Petitioner has exhausted his state court remedies for the purpose of federal habeas corpus review. The following records have been submitted to the court for consideration in this matter:

A.     Petitioner's direct appeal brief.

B.     The State's brief in Petitioner's direct appeal.

C.	Petitioner's appellate reply brief.

D.	Summary Opinion affirming Petitioner's judgment and sentence. *Anderson v. State*, No. F-2011-94 (Okla. Crim. App. Mar. 6, 2012).

E.	Transcripts of court proceedings.

F.	State court record.

On November 10, 2008, Petitioner was charged by Information in Pontotoc County District Court Case No. CF-2008-499. On January 27, 2010, he entered a plea of Not Guilty by Reason of Insanity, and on July 29, 2010, he waived his right to a jury trial. Following a non-jury trial, the Pontotoc County District Court found Petitioner guilty of Counts 1, 2, 3, 4, 6, and 7.[1]

## Standard of Review

Under the Anti-Terrorism and Effective Death Penalty Act (AEDPA), federal habeas corpus relief is proper only when the state court adjudication of a claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

## Sufficiency of the Evidence

The record shows that on direct appeal, the Oklahoma Court of Criminal Appeals (OCCA) denied relief on Petitioner's claim that the evidence was insufficient to find him

---

[1] The trial court found Petitioner not guilty of Counts 5 and 8. (Dkt. 13-5 at 2-3).

sane at the time of the offenses:

> [W]hile Appellant presented evidence calling into question his sanity at the time of the offenses, there was sufficient evidence from which a rational fact-finder (in this case, the trial judge) could conclude, beyond a reasonable doubt, that Appellant understood right from wrong at the time. *Taylor v. State*, 881 P.2d 755, 758 (Okla. Crim. App. 1994).

*Anderson v. State*, No. F-2011-94, slip op. at 2 (Okla. Crim. App. Mar. 6, 2012). Petitioner alleges the OCCA's denial of his claim was based on an unreasonable determination of the facts in light of the trial evidence, because no reasonable factfinder could have determined that the State proved beyond a reasonable doubt that he was sane. Respondent asserts the OCCA's decision was neither contrary to, or an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d).

"Sufficiency of the evidence can be considered to be a mixed question of law and fact." *Case v. Mondagon*, 887 F. 2d 1388, 1392 (10th Cir. 1989), *cert. denied*, 494 U.S. 1035 (1990). In federal habeas review of a state court conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

The Supreme Court repeatedly has emphasized the deference the reviewing court owes to the trier of fact and "the sharply limited nature of constitutional sufficiency review." *Wright v. West*, 505 U.S. 277, 296 (1992) (citing *Jackson*, 443 U.S. at 319). "[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume--even if it does not affirmatively appear in the record--that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326. The court must "accept the [factfinder's] resolution of the

evidence as long as it is within the bounds of reason." *Grubbs v. Hannigan*, 982 F.2d 1483, 1487 (10th Cir. 1993) (citing *United States v. Edmondson*, 962 F.2d 1535, 1548 (10th Cir. 1992)). "To be sufficient, the evidence supporting the conviction must be substantial; that is, it must do more than raise a mere suspicion of guilt." *Beachum v. Tansy*, 903 F.2d 1321, 1332 (10th Cir.), *cert. denied*, 498 U.S. 904 (1990) (citing *United States v. Troutman*, 814 F.2d 1428, 1455 (10th Cir. 1987)).

"[W]here a sufficiency challenge was resolved on the merits by the state courts, . . . AEDPA adds an additional degree of deference, and the question becomes whether the OCCA's conclusion that the evidence was sufficient constituted an unreasonable application of the *Jackson* standard." *Diestel v. Hines*, 506 F.3d 1249, 1267 (10th Cir. 2007) (citations and internal quotation marks omitted), *cert. denied*, 553 U.S. 1079 (2008). This standard is called "deference squared." *Hooks v. Workman*, 689 F.3d 1148, 1166 (10th Cir. 2012 (quoting *Young v. Sirmons*, 486 F.3d 655, 666 n.3 (10th Cir. 2007)).

To determine whether there was sufficient evidence presented at trial to sustain Petitioner's convictions, the Court first must look to Oklahoma law for the elements of an insanity defense. The *M'Naughten* rule is the test for insanity in Oklahoma. Okla. Stat. tit. 21 § 152.

> The initial burden is on the defendant to establish a reasonable doubt as to his sanity. *Munn v. State*, 658 P.2d 482 (Okla. Crim. App. 1983). If the defendant establishes a reasonable doubt of his sanity, the presumption of sanity vanishes and it is incumbent upon the State to prove beyond a reasonable doubt that the defendant could distinguish between right and wrong at the time of the offense. *Id*. at 484.

*Clark v. State*, 718 P.2d 375, 377-78 (Okla. Crim. App. 1986).

A person is insane when that person is suffering from such a disability of

reason or disease of the mind that he/she does not know that his/her acts or omissions are wrong and is unable to distinguish right from wrong with respect to his/her acts or omissions. A person is also insane when that person is suffering from such a disability of reason or disease of the mind that he/she does not understand the nature and consequences of his/her acts or omissions.

*Medlock v. State*, 887 P.2d 1333, 1342 n.12 (Okla. Crim. App. 1994).

Under Oklahoma law the defendant bears the burden of raising a reasonable doubt of his sanity at the time of the crime. If that burden is met, it is incumbent upon the State to prove beyond a reasonable doubt that the defendant could distinguish between right and wrong at the time of the offense.

*Diestel v. Hines*, 506 F.3d 1249, 1267 (10th Cir. 2007) (citation and internal quotation marks omitted), *cert. denied*, 553 U.S. 1079 (2008). "Under Oklahoma law, the [finder of fact] 'can disregard entirely the testimony of psychiatric or medical experts and find sanity from testimony of lay witnesses alone.'" *Diestel v. Hines*, 506 F.3d 1249, 1268 (10th Cir. 2007) (quoting *McGregor v. State*, 855 P.2d 1366, 1376 (Okla. Crim. App. 1994)).

## **Trial Testimony**

Petitioner based his insanity defense on the testimony of his wife Phileshia Anderson, his friend Erika Oseguera, hospital nurse Kathy Walk, R.N., and his expert witness Dr. Mickey Ozolins. The State presented witnesses who testified about Petitioner's alleged criminal actions in the early hours of November 1, 2008. The parties agreed to submit the testimony of Earl Wayne Wright and Cody Ayers through the preliminary hearing transcript, because those two witnesses were not available to testify at trial. (Tr. II, 75-76; Dkt. 13-4).

The parties stipulated that, if called as a witness, Deputy Jimmy Bynum of the Pontotoc County Jail would testify that on the morning of November 1, 2008, he administered a five-panel drug and alcohol screen to Petitioner. Deputy Bynum also would testify that the screen was negative for drugs and did not indicate the presence of alcohol.

(Tr. II, 75-77).

**Phileshia Anderson**, Petitioner's wife, testified that on the evening of October 31, 2008, she and Petitioner attended a Halloween party at a friend's house and left around 11:30 p.m. When they left the party, Petitioner did not appear to be "overly intoxicated." Because they had been drinking, however, Petitioner and Phileshia did not think they should drive. Therefore, Phileshia's mother picked them up from the party and drove them to the home of Erika Oseguera, a friend who lived three houses down from Petitioner and Phileshia in Ada, Oklahoma. Their drinking continued at Erika's house, and over the course of the evening, Petitioner consumed at least seven beers, tequila, and a margarita. (Tr. I, 5-22; Dkt. 13-2).

Phileshia helped Erika with cooking, while Petitioner and two other men were outside. Phileshia then joined Petitioner, and they were playing around and dancing in the garage. Phileshia ran up to Petitioner, jumped on him, and wrapped her legs around him. This caused Petitioner to fall over a motorcycle in the garage and hit his head on the raised lip of the concrete floor. Petitioner lay on the floor for a minute, then stood up, raised his arms, and began screaming. Phileshia asked him what was wrong, but Petitioner told her to get away, and he started kicking things and not acting like himself. (Tr. I, 7-9).

Phileshia tried to calm Petitioner, but his behavior worsened. He then walked out of the garage with Phileshia behind him, and they went into their own garage down the street. Phileshia shut the garage door, but he would not calm down. She pleaded with him not to act that way, but he told her to get away from him. He said he did not know her, and he did not know they had a house or children. When Phileshia got him inside their house, he threw a cup against the door, and she again could not calm him down. He also put his head through a wall at the house. He then walked away from the house around 2:30-3:00 a.m. (Tr. I, 9).

Petitioner had his cell phone with him, and Phileshia called him repeatedly, but he did not answer. When he finally answered his phone, she asked where he was, so she could come and get him. He said he did not know his location, but he was in a pasture. She told him she was his wife, but he said he was not married and had no children. He then said that nobody loved him, and he was going to Mexico. (Tr. I, 10).

About two hours later, Officer Rhodes of the Ada Police Department arrived at Phileshia's house. Phileshia told Officer Rhodes that she and Petitioner had been at the neighbor's house, laughing and joking and pushing each other around, when Petitioner suddenly became angry and out of control. She never mentioned to the officer, however, that Petitioner had fallen and hit his head on concrete, that he had lost consciousness, that he grabbed his head afterward, or that Petitioner had screamed irrationally and said he had no wife or children. She also omitted this information from her written witness statement for the police. (Tr. I, 24-28; Dkt. 13-3, 130; State's Exhibit 1).

After learning that Petitioner had been arrested, Phileshia saw him at the county jail the next morning. She observed that his thought process seemed slower than usual, and he used words that a five-year-old would use in a conversation. He was holding his head and said he had a headache, and his eyes looked very "glazy." As soon as Petitioner bonded out of jail, Phileshia took him to the emergency room of the Carl Albert Indian Hospital. At the time of his arrest, Petitioner was employed as a nurse at that hospital. (Tr. I, 11-14; Dkt 13-3; Dkt. 1 at 8).

Phileshia further testified that after the incidents at issue, Petitioner was placed on short-term disability for approximately five months. He did not begin communicating normally for about three months, and during that time he was frustrated with his speech and

had more difficulty relating to his family. Phileshia also testified that he was "berserk" and potentially violent during that period. Petitioner returned to work in May of 2009. (Tr. I, 15-17).

Erika Oseguera, Petitioner and Phileshia's friend and neighbor, testified that late on October 31, 2008, or early the next morning of November 1, 2008, she, Petitioner, and Phileshia left a Halloween party and went to Erika's house. Erika heard Petitioner scream, and she turned and saw him on the garage floor. He had fallen over a motorcycle. Petitioner appeared to be asleep for a few seconds, but he woke up and screamed again. Erika, whose English is imperfect, said that Petitioner then "turn transformation . . . like older person, like crazy." "He's screaming. He no recognize--recognize her. Wife." Petitioner then stood up and left Erika's house to go to his home. Erika did not mention in her written witness statement to the police that Petitioner hit his head on the concrete in her garage. (Tr. I, 43-49, 62; Dkt. 13-3, 125).

Kathy Walk, R.N., was a nurse on duty at the hospital when Petitioner and his wife arrived on November 3, 2008. She had known Petitioner for at least eight years and considered him a good friend. Walk testified that she tried to interview him, but he could not or would not answer her questions, except to say nothing was wrong. Walk also testified that Petitioner "really appeared drunk," but she was not aware of anyone who believed he was under the influence of alcohol. Petitioner's speech was somewhat slurred, and his pupils were "really uneven." The Emergency Physician Record - Head Injury stated Petitioner's pupils were uneven, but he was "alert, oriented x3, cooperative, interactive, with normal mood/affect." Walk advised Phileshia to take him to a neurosurgeon immediately, and Petitioner was checked into the hospital. (Tr. I, 120-23, 151; Dkt. 13-3).

**Billy Hale** testified that he and his co-worker Earl Wayne Wright stayed in the Village Inn Motel in Ada, Oklahoma, the night of October 31, 2008. Around 10:30 to 11:00 p.m., they heard a loud kick at the door. The door then opened, and Hill saw a man standing at the end of Hill's bed. The only light in the room was from outside, but Hale could see the man was wearing tan shorts and a white shirt covered in what appeared to be blood. When Wright tried to talk to the man, the man hit Wright across the room and yelled that he wanted money and a vehicle. (Tr. II, 17-19; Dkt. 13-4).

Wright said he did not have any money, which appeared to make the man angrier. According to Hale, Petitioner appeared to understand what he was doing. Petitioner also appeared to understand Hale when Hale said he had no money. (Tr. II, 27).

When Wright got up to find the car keys in his pants, the man grabbed the microwave, which was attached to the refrigerator in the room, and tried to swing it around to hit Hale and Wright. The man said something about the military and was yelling that he had killed three people. The man also threatened Hale and Wright that they would be next, if they did not give him what he wanted. Hale was scared and believed the man was serious. Wright gave the man the keys to his company's Suburban, and Hale gave the man two dollars, which later was found in the passenger seat of the wrecked Suburban. The man asked which vehicle the keys fit, and he was told it was the Suburban outside the door to the motel room. The man got in the vehicle, spun out, and left quickly. Hale thought the man was under the influence of alcohol or some kind of narcotic. (Tr. II, 19-32; Dkt. 13-4).

**Earl Wayne Wright** testified at the preliminary hearing that he was rooming with his co-worker Billy Hale at the Village Inn Motel on November 1, 2008. They went to bed at approximately 10:00 p.m. to 10:30 p.m., but were awakened by a loud noise and a man

standing at the foot of the bed. The man said loudly that "he was from the military, and he had already killed three people and they were making him do it, to give us [sic] the keys to the vehicle we were driving." Wright said, "Let's calm down and talk about it," as he got out of bed and stood up. When Wright took a couple of steps toward the man, the man took two quick steps and hit Wright, knocking him down. The man then began screaming, "Give me the keys." (P.H. Tr. 4-5; Dkt. 13-1).

Wright was trying to get back on his feet as he tried to talk to the man again. The man went over by the television, as Wright continued to speak calmly. The man hit Wright again and knocked him into the bathroom sink area. As Wright got up again, the man said, "Give me the keys." Wright sat on the bed and gave him the keys. (P.H. Tr. 5-6).

The man said he wanted money, but Wright only had some change in his pants pocket. Wright handed the man his pants, but the man threw the pants down and approached Hale, who still was lying in bed. During the altercation, the man backed up and attempted to grab the microwave, which was mounted to the refrigerator. Wright believed the man intended to hit him with it. The cords behind the microwave, however, prevented the man from being able to lift the microwave/refrigerator more than two feet off the ground. (P.H. Tr. 6-8).

The man threatened Hale and told Hale to give him some money. Hale reached into his wallet and gave him some cash. The next thing Wright heard was the shutting of the Suburban's door and the man peeling out of the parking lot at a high rate of speed. Wright saw that the door to the motel room had been kicked in or shouldered in, and there was a slight footprint on the door. Wright testified that to the best of knowledge, there were no drugs or alcohol in the company vehicle. (P.H. Tr. 6-7).

Wright further testified that he could not see the intruder's face, and he only saw the

outline of his body. He was wearing shorts and a light-colored T-shirt, possibly white, with blood around the collar. Wright's previous employment included four years as a bartender. In that position he was responsible for determining whether a customer was too intoxicated to be served additional alcohol. In Wright's opinion, the man who broke into the motel room was under the influence of "something." (P.H. Tr. 8-9, 12).

**Cody Ayers** testified at the preliminary hearing that in the early morning hours of November 1, 2008, he was involved in a serious highway collision in Pontotoc County while driving his Toyota Tacoma behind a semi truck. Ayers was not sure whether the semi truck was going to turn into a trucking company, so he turned off his vehicle's cruise control. The next thing he knew, there was a bright light in his rearview mirror, followed by an impact that caused him to go off the road to the right. Ayers tried to steer back onto the road, when he felt a second impact, and his truck skidded sideways. He then lost control of the vehicle and left the pavement with his vehicle flipping twice before coming to rest. (P.H. Tr. 25-26; Dkt. 13-1).

Although he was somewhat "dazed and confused," Ayers shut off his vehicle and located a flashlight before exiting the passenger side of his truck. He saw the other vehicle, a Suburban with smoke coming from it, about a quarter of a mile east of his vehicle. Ayers went across the road to see if everyone in that vehicle was all right. He saw blood on the steering wheel, dashboard, and driver's seat, but no one was inside. He, therefore, started looking up and down the road, in case someone had been ejected. (P.H. Tr. 26-27).

A woman stopped to see if Ayers was all right, and then the Lighthorse Police and an ambulance came to take him to the hospital. He suffered lacerations on his ear and the side of his face, as well as cuts on his arm and severe shoulder pain. (P.H. Tr. 27-30).

**Casey Gentry**, an officer of the Chickasaw Nation Lighthorse Police Department, testified that on November 1, 2008, he received a call concerning an accident with injury. When he arrived at the scene, he observed a pickup that apparently had rolled or been in an accident on the side of the highway. Another vehicle, a Suburban, also appeared to have been in the accident. The driver of the pickup was standing with blood on his face, and he reported that someone came up behind him and ran him off the road. The pickup driver, however, had not seen anyone get out of the Suburban. (Tr. II, 46-48, Dkt. 13-4).

Officer Gentry, Deputy Holloway, and Deputy Hurley went to the Danielson Oil Company, which was just off the highway. They noticed some open doors, so they checked all the buildings to make sure the other driver was not hiding there. When they found no one, they returned to the scene to help with clearing the roadway. (Tr. II, 48).

Back at the accident scene, Gentry heard what appeared to be a large piece of machinery or something with a big engine that repeatedly started and died. A few minutes later, he noticed a semi-trailer truck drive by on an adjacent county road that was almost parallel to the accident scene. Even though there were police officers and lights in the middle of the road, the driver of the semi-trailer truck did not look at the officers and just kept driving. (Tr. II, 48-49).

Officer Gentry told the other officers that he was going to make an investigatory stop to find out if the semi-trailer truck driver had seen anyone running around. Gentry drove behind the semi-trailer truck, but when the truck reached an intersection of the county road and the highway, it did not stop. Instead, the truck driver made a big, wide turn. Because the driver was able to handle the gears, Gentry thought the driver probably was someone leaving early for work. (Tr. II, 49-50).

12

Gentry stopped the semi-trailer truck, and when he shined his spotlight on the truck's side mirror, he could see that the driver had blood all over his face. Gentry got on the radio to request back-up, then he used his PA to order the semi-trailer truck driver out of the vehicle. When the semi-trailer truck driver got out of the truck, Gentry used his vehicle door for cover and ordered the driver to face away from him. Gentry could see blood on the driver's face and T-shirt. The driver complied with Gentry's order to walk backward to the sound of Gentry's voice. Gentry then ordered him down on his knees and took the man into custody. When another officer showed up, Gentry handcuffed the driver. The driver was very calm and appeared to understand Gentry's directions and complied without delay or confusion. Gentry then recognized Petitioner as someone he had known for about ten years. (Tr. II, 50-62 ).

**Brian Bagwell,** a state trooper with the Oklahoma Highway Patrol, testified that on November 1, 2008, he responded to a collision within Pontotoc County. On his way to the scene, he was notified by dispatch that the Chevrolet Suburban involved in the collision had been stolen approximately 15 minutes earlier from the Village Inn Motel. Bagwell arrived at the scene to find a Toyota pickup sitting upside-down and a Suburban that had run off the road and through a fence. He learned that the driver of one vehicle had been transported to a hospital, and the other driver had left the scene. (Tr. II, 4-14; Dkt. 13-4).

While at the scene, Bagwell was contacted by Officer Casey Gentry of the Lighthorse Police for assistance in making a felony stop on a semi-trailer truck. Trooper Bagwell left the collision scene and went to assist Officer Gentry less than a mile away. Gentry had the semi truck with a flatbed trailer stopped, and the driver was in handcuffs. At trial, Gentry identified Petitioner as the driver of the truck. (Tr. II, 8-9).

Trooper Bagwell observed a couple of minor scratches above Petitioner's eyes and that Petitioner had a strong odor of an alcoholic beverage on this breath and person. Petitioner was placed in the front seat of Trooper Bagwell's car. When Bagwell opened the door to read Petitioner the State's Implied Consent Test Request, he saw that Petitioner had passed out. Bagwell awakened Petitioner to read the test request to him. Petitioner listened to Bagwell and acknowledged what Bagwell said, but Petitioner said he would not take the test. Bagwell told Petitioner he would be charged with DUI with respect to the semi-trailer truck, and Bagwell asked Deputy Hurley of the Pontotoc County Sheriff's Office to transport Petitioner to the county jail. A wrecker was called to impound both vehicles from the collision. (Tr. II, 4-12).

**Brad Holloway** testified that on November 1, 2008, he was employed with the Chickasaw Lighthorse Police. At about midnight to 1:00 a.m., he answered Officer Casey Gentry's call for assistance in making a felony traffic stop. Petitioner was in custody, and Holloway and Trooper Bagwell checked the semi-trailer truck to make sure there were no other occupants. Petitioner had a slight odor of alcohol but appeared to understand what was happening. Petitioner had some cuts and scrapes on him but did not appear to be in any medical distress. Holloway had known Petitioner for eight to ten years, and Petitioner did not act in a manner that was different from his previous behavior. (Tr. II, 42-46; Dkt. 13-4).

**Michael Hurley**, a deputy with the Pontotoc County Sheriff's Office also received a call on November 1, 2008, from Officer Gentry, requesting assistance on a felony stop southeast of Ada, Oklahoma. When Deputy Hurley arrived at the scene, he observed a semi-trailer truck on the side of the road and Petitioner in Trooper Bagwell's car. Bagwell asked Hurley to transport Petitioner to the county jail. (Tr. II, 37-39; Dkt. 13-4).

Hurley took Petitioner out of Bagwell's vehicle and walked him to Hurley's vehicle. Petitioner had blood on his face and shirt, so Hurley asked Petitioner if he needed an ambulance. Petitioner appeared to understand the question and replied that he did not need medical help. Hurley could not remember whether Petitioner appeared intoxicated. Petitioner did not say anything during the trip to the jail or during the booking process. (Tr. II, 39-41).

**Shane Jones**, a detective for the City of Ada Police Department, testified that on November 1, 2008, he was called by dispatch to a first degree burglary at the Village Inn Motel. At the motel he learned that a vehicle had been stolen and subsequently involved in a wreck a few miles away. The door jamb to the victims' motel room was broken, and there was blood on the wall, the television screen, and the microwave/refrigerator. The two victims stated the blood came from the suspect when he entered their motel room and touched those areas. (Tr. II, 63-64; Dkt. 13-4).

The victims reported they had been asleep before the door was breached and the suspect demanded money and a vehicle. One of the victims had a physical altercation with the suspect, and the other victim gave money to the suspect. After the victims gave the intruder the keys to their company vehicle, he exited the room, got in the vehicle, and sped away. Detective Jones also discovered that the vacant motel room next to the victims' room appeared to have a kick mark. That mark appeared to be the same shoe print that was on the door to the victims' room. (Tr. II, 64-66).

After Petitioner was booked into the jail, Jones attempted to interview him around 2:00 a.m., but Petitioner invoked his right to counsel. Jones told Petitioner that his asking for counsel was "probably the smart thing for [him] to do." Petitioner replied, "I sure wasn't doing the smart thing last night. That was some stupid stuff." (Tr. II, 70-72).

Detective Jones further testified that Petitioner's history indicated he had a misdemeanor marijuana charge when he was 18 years old. Jones believed that at some point in the early 2000s, Petitioner had a possession charge that was resolved in Drug Court. (Tr. II, 72-73).

**Gregory Perry** testified that he was the owner of True Steel, a construction company in Ada, Oklahoma. In the early morning hours of November 1, 2008, one of the investigating officers called him about a semi-trailer truck that had a possible connection to a pending investigation. Perry went to the location of the truck and determined that the truck was in fact his company's vehicle. The truck had been on a storage lot with the ignition keys inside the vehicle. However, Petitioner did not have permission to drive it. (Tr. II, 32-36).

**Mickey Ozolins, Ph.D.**, a clinical neuropsychologist with Mercy Health System in Oklahoma City, testified for the defense as an expert witness. She stated she had interviewed Petitioner on January 5, 2010. She also had interviewed Petitioner's wife and relied upon Erika Oseguera's subjective witness affidavit. In addition, Dr. Ozolins had reviewed the November 3, 2008, emergency room records from Carl Albert Indian Hospital; some of Petitioner's follow-up medical records from Drs. Denson, Hoffman, and Davis; police reports; relevant affidavits; Petitioner's high school and college transcripts; and records from the Peer Assistance Program. She did not personally administer any tests to Petitioner, and she had not spoken to any of the victims or law enforcement officials involved in this case. (Tr. I, 67-70, 74-75, 83-84, 88-90, 104, 113; Dkt. 13-3).

Dr. Ozolins's expert opinion was based upon (1) Petitioner's reported behavior after his alleged fall, (2) his failure to recognize that he had a wife and children, (3) his unequal pupils, and (4) the conflicting CT scan reports. Based on the information available to her,

Dr. Ozolins testified she believed the records supported a conclusion that Petitioner had sustained a concussion, which is a type of mild traumatic brain injury. Petitioner also could have suffered a secondary concussion from the car accident that same evening. She opined that Petitioner "was in a state of post-traumatic amnesia which is a type of delirium." In addition, Petitioner's aggressive and violent behavior could have been a reflection of the confusion, delirium, hallucinations, or delusions that can appear in the acute stage of a brain injury. Dr. Ozolins testified that Petitioner had "a low frustration tolerance and may be irritable." She also stated that the introduction of alcohol or a mild traumatic brain injury could either enhance or minimize an individual's response to frustration. (Tr. I, 69-70, 75-76, 82, 95-99, 104).

Dr. Ozolins concluded that Petitioner was suffering from neurologically-induced aggression in addition to post-traumatic confusion and amnesia. She also was of the opinion that at the time of the crimes, he suffered from a mental defect, and within a reasonable degree of medical certainty, he was not able to distinguish right from wrong or to understand the nature and consequence of his actions. (Tr. I, 77-78, 108, 114). She continued:

> [T]he reports suggest he was delusional and confused even about where he was and his current circumstances. The concept of post-traumatic amnesia essentially refers to the--among other things--the inability to hold any information in mind even for more than a second or so, so that the ongoing stream of events isn't very readily tracked by a person when they're in the stage, and they may not at all be even in touch with reality at that stage.

(Tr. I, 78). Defense counsel asked Dr. Ozolins a series of questions, including:

> Q.  Do you believe that on the night of October 29 [sic], 2008, Mr. Anderson was suffering from a disability of the mind?
>
> A.  Yes.

Q.    Do you believe that disability rendered him unable to understand the nature and consequences of his acts or omissions?

A.    Yes.

Q.    Doctor, based again on your interview and all the objective evidence you've had at your disposal, do you believe Mr. Anderson has recovered from that situation?

A.    Yes.

(Tr. I, 80-81).

On cross-examination, Dr. Ozolins testified she was not a medical doctor, but she had a Ph.D. in psychology and an APB in clinical neuropsychology. She had talked with Petitioner and his wife Phileshia about the events in question and relied on their subjective reports in forming her opinion. The two radiologists who read the CT scan came to conflicting conclusions, and Petitioner's drug screen was negative that night. Further, Petitioner's unequal pupil size suggested head trauma that led to swelling of his brain. (Tr. I, 70-71, 74-76, 81-87).

Dr. Ozolins further testified on cross-examination that she was aware of the car collision Petitioner had caused. This event could have resulted in secondary concussion syndrome, where the effect of a second impact exacerbates the original injury. She did not believe Petitioner's escalating behavior could be explained by his alcohol consumption, because of his "sudden dramatic shift in his behavior in a rage-type response that went on to reflect confusion, a delirium, delusional thinking, and a complete lack of inhibition." It also was "within the realm of possibility" to "expect someone who's operating from delusions and delirium and [is] unable to formulate reasoning of thought to kick a door in of a motel room, find that it's empty, and move to a next door of the motel room." (Tr. I, 98-101).

18

Dr. Ozolins testified that someone who confronts two people and is "able to clearly and definitively demand keys to a vehicle" does not necessarily have "the ability to reason and process logically." In addition, Petitioner's demands for money from the two men in the motel room did not indicate "logical reasoning and the ability to understand." Petitioner's taking the vehicle key, getting in the vehicle, and driving off with it were automatic responses to stimuli, when "[h]e had some sort of a wish to be in a vehicle and responded to that." However, Petitioner's "understanding and reasoning was extremely limited in that situation." (Tr. I, 101-03).

Dr. Ozolins conceded she could point to no physical evidence that Petitioner did not understand what he was doing. When confronted with Petitioner's acknowledgment that his actions that night were "stupid" and not "smart," Dr. Ozolins dismissed Petitioner's statements as not having "much significance" with respect to his actions at the time. (Tr. I, 110).

## Conclusion

The record shows that Petitioner consumed an unknown quantity of alcohol on Halloween night. Both his wife Phileshia Anderson and his friend Erika Oseguera testified that after he fell and hit his head on concrete, Petitioner's behavior changed immediately. Neither woman, however, included these crucial facts in her written witness statement for the police. In addition, when Officer Rhodes came to Phileshia's house in response to Petitioner's actions that night, Phileshia did not tell the officer that Petitioner had fallen and hit his head on concrete, or that he had lost consciousness, grabbed his head afterward, screamed irrationally, and said he had no wife or children.

Petitioner's expert witness Dr. Ozolins opined that Petitioner sustained a mild

traumatic brain injury as a result of his fall in Erika's garage. Dr. Ozolins based her conclusions on the subjective reports of Petitioner, his wife, and Erika Oseguera, along with information in police and medical reports. In summary, Dr. Ozolins's opinion was that on the night in question, Petitioner "was suffering from a disability of the mind" that "rendered him unable to understand the nature and consequences of his acts or omissions," and he was not able to distinguish between right and wrong.

Mr. Hale, one of the victims at the motel, testified that Petitioner appeared to understand what he was doing when Hale told Petitioner he had no money and Petitioner became angry. Furthermore, Officer Gentry testified that after booking, Petitioner acknowledged he had done some "stupid stuff," and he had not done the "smart thing."

In *Diestel*, the Tenth Circuit noted that the lay witnesses did not testify about their opinions of the Petitioner's sanity, but they provided "observations from which others . . . could draw inferences." *Id.*, 506 F.3d at 1271. Acknowledging that in some cases, lay testimony may be insufficient to rebut the presumption of insanity, "the general rule is that lay testimony can suffice." *Id.* (citations omitted).

After careful review of the record and considering the evidence in the light most favorable to the prosecution, the Court finds the evidence was sufficient under the standard of *Jackson v. Virginia*. The Court further finds the OCCA's decision on this matter was not contrary to, or an unreasonable application of, clearly established Supreme Court law, and the OCCA's decision was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Petitioner's petition for a writ of habeas corpus is denied.

**Certificate of Appealability**

The Court finds Petitioner has failed to make a "substantial showing of the denial of a constitutional right," as required by 28 U.S.C. § 2253(c)(2). In addition, he has not shown "at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether [this] court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Therefore, a certificate of appealability cannot be issued.

**ACCORDINGLY**, Petitioner's petition for a writ of habeas corpus (Dkt. 1) is DENIED, and Petitioner is DENIED a certificate of appealability.

**IT IS SO ORDERED** this 16th day of March 2017.

James H. Payne
United States District Judge
Eastern District of Oklahoma